## MACKIE *against* PLEASANTS.

EXCEPTIONS to a report of referees.

1810.

Philadelphia,
Monday,
March 26.

This action was brought upon two policies of insurance, dated the 25th of *March* 1809, and signed by the defendant, as president of the United States Insurance Company. The one was on the " good *British* brig called the *John*," valued at 8000 dollars, and the other upon her freight, valued at 4000 dollars, at and from *Havanna* to *Baltimore*, at a premium of four per cent. At the bottom of each policy was written a memorandum, that the insurance was " declared ".to be against perils and dangers of the sea only,.and to end " on capture."

The brig and her cargo were totally lost upon a·reef of rocks on the 19th of *March*.

The referees to whom the cause was submitted under a rule of court, reported in favour of the plaintiff as for a total loss; and to this report the defendant filed the following exceptions.

1st. That the terms " *British* brig" amounted to a warranty that the vessel was a *British* brig, the proof of which fact was indispensably requisite to the plaintiff's recovery. But no such proof was furnished to the referees. On the contrary it was in evidence, that the said brig had not a *British* register, or any other document, giving to her the character and privileges of a *British* vessel; and it was not pretended by the plaintiff, nor was the least evidence offered to the referees to shew, that she was a *British* built vessel.

2d. That if the terms in the policy did not amount to a warranty, the order of insurance, which was in the same language, was a representation that the brig was a *British* vessel, which was material, and should have been substantially proved. But no such proof was furnished to the referees.

3d. That it was proved to the referees that the brig was not seaworthy when the risk commenced.

Upon the examination of the referees, who were all merchants and underwriters, they stated, that it was proved to them that the brig was condemned as unseaworthy at *New*

A vessel, stated in the body of the policy to be the " good *British* brig called the *John*," was insured at the usual sea risk premium from *Havanna* to *Baltimore*, with a written memorandum at the foot of the policy, that the insurance was against *perils of the sea only*, and was to end on capture. *Held*, that the words " *British* brig," even if a warranty, did not imply that she was a *British* registered vessel, but merely that she was owned by a *British* subject; and it being proved that the owner was a *Scotchman* by birth, and that he navigated the vessel under a clearance and licence from the *British*, customhouse at *New Providence*, this was sufficient *prima facie* to shew that he continued to be a *British* subject, without shewing his domicil or place of habitual residence.

*Providence*, a short time before the voyage insured, and was bought by *Mackie*. That this condemnation they believed was produced by bribery, the brig having before that belonged to an *American* of the name of *Toby*, who had sailed in her from the *United States* to the *West Indies*, and who himself requested the survey and condemnation. That *Mackie* navigated her from *New Providence* to the *Havanna*, where considerable repairs were done upon her. That having taken in an entire cargo on freight, he sailed from the *Havanna* on the 11th *March* at 5 P. M. having several masters of vessels on board as passengers, and that at midnight, upon the pumps being sounded, though there had not been any bad weather, it was found that there were two feet of water in the hold, in consequence of which she put back. That the leak was ascertained to be in the side of the brig, which had not been perfectly caulked; but that after caulkers were obtained, the leak was very soon repaired, and the brig sailed again on the 16th, and was lost on the 19th. That most of the brig's papers were lost at the time of the shipwreck, and among them as was stated by a witness, a clearance and licence from the customhouse at *New Providence*. But there was no register.

The grounds upon which they made their report, the referees said were these. They did not consider the terms " *British* brig," as a warranty, but as description only, and immaterial to the risk. That this opinion was founded upon the position of the terms in the policy, it being the usage in *Philadelphia* to insert every thing that was intended to be a warranty, in a written memorandum at the foot of the instrument. That they thought it immaterial, because the insurance was only against the sea risk, and the premium was the common rate for that risk at that season of the year, upon vessels that were known; and therefore they did not require proof of a register. That they were of opinion however that *Mackie* the owner was a *Scotchman*, partly because he had a very broad *Scotch* accent, and partly because he had brought a letter of introduction from *Scotland* to a gentleman in *Philadelphia*, and had also stated to a witness such circumstances in relation to a family in *Scotland*, as the witness believed that no one but a person intimately acquainted there, could know. But that they had no evidence of his domicil or residence

àt the time of the insurance, or that he had ever changed the
domicil of his birth. They were perfectly satisfied that as a
description it was well proved; but one of them said, that
had he considered it a warranty, he would have required
more proof. With respect to seaworthiness, they were clear
that the brig was seaworthy, when she sailed the second
time; and they supposed the leak had arisen from the acci-
dental omission of a foot of oakum.

1810.

MACKIE
*v.*
PLEASANTS.

*Binney* and *Rawle* for the defendant. 1. The terms
" *British* brig" in the body of the policy, are a warranty.
They are a written declaration upon the face of the policy,
of a fact in respect to the subject insured, which is the pro-
per definition of a warranty. *Park* 318, 319. *Marsh.* 248.
*Goix* v. *Low* (a). The referees have made a plain mistake
in supposing that the place where the declaration is inserted
is material, and that usage controls the law in ascertaining
what is a warranty. The warranty may be at the bottom or
at top, it may be written transversely or otherwise. The
place and the manner of writing it are alike immaterial.
*Bean* v. *Stupart* (b), *Park* 322. In *Goix* v. *Low* the insur-
ance was " on the *American* ship *Minerva*," which words
were in the body of the policy, like these; and by three
judges against one, it was held to be a warranty. *Le Mesurier*
v. *Vaughan* (c) is to the same purpose. The insurance was
stated to be on the good ship *called* " the *American* ship
" *President*;" the order was to effect insurance on the good
*American* ship *called* the *President*. It was a plain mistake
by the broker; and the court agreed that the underwriter had
lost a warranty by it; that is, it would have been a warranty,
if the order had been pursued. So in *Lothian* v. *Hender-
son* (d), which was an insurance on " the *Catharine*, an
" *American* vessel," it was agreed by all the judges that such
a description amounted to a warranty. The objection to its
being a warranty, is that it was immaterial, because the
policy was against sea risks only. But whether material or
not, is not the question. It is of no importance for what
view a warranty is introduced, or whether the party had any

(a) 1 *Johns. Cases* 343.                    (c) 6 *East* 382.
(b) *Dougl.* 12.                                  (d) 3 *Bos. & Pul.* 499.

1810.

MACKIE
v.
PLEASANTS.

view at all. *Park*, 318, 319. *De Hahn* v. *Hartley* (a). Of course materiality is no test of a warranty. But in fact it was material. The embargo had been in force fifteen months at the time of this insurance. No *American* vessel, it is probable, could have been at that time lawfully employed in the *West Indies*. All were subject to seizure and detention by the *American* cruizers. *British* vessels properly documented, were not; and it therefore became material that the risk should be *British*. The limitation of the policy to sea risks did not affect the materiality. The insurance was to cease upon *capture*, but not upon *detention;* and although a limited policy, the insured might even have deviated to avoid arrest. *Scott* v. *Thompson* (b), *Robinson* v. *The Marine Insurance Company* (c). If detained, the sea risk might therefore have been prolonged and increased; and the same would have been the result of a deviation to avoid arrest. Both these liabilities to an increased risk, were peculiar to an *American* vessel. A *British* vessel was subject to neither. The mere sea risk of *British* vessels is less than any other; they are better found and navigated.

Supposing it to have been a warranty, it meant that the brig was entitled to the privileges of a *British* vessel. *Tabbs* v. *Bendelack* (d). She must be *British* to the purpose of being protected, and must be documented as such. *Barzillay* v. *Lewis* (e). If the *English* navigation laws are resorted to for the definition of a *British* vessel, she must be *British* built, owned, and registered. Such alone are by the express words of the statutes, *British* ships. 26 *Geo*. 3. *c*. 60. *sec*. 1., 27 *Geo*. 3. *c*. 19. *sec*. 13. It has never been decided that any other vessels are at this time entitled to the protection of the *British* flag; none else are subject to the convoy acts, whose object is protection. *Long* v. *Duff* (f). If the commercial import of the words is adopted, they cannot mean less than that the owner was a *British* subject, residing in the dominions of *Great Britain*. It is not enough that he is a subject. Where there is nothing special in the conduct of the vessel, the national character is determined by the *residence* of the

(a) 1 *D. & E.* 346.           (d) 1 *Marsh.* 386. 2d ed.
(b) 4 *Bos. & Pul.* 181.       (e) 1 *Marsh.* 598. 2d ed.
(c) 2 *Johns.* 89.             (f) 2 *Bos. & Pul.* 209.

owner. *The Vigilantia* (a), *The Citto* (b). *The Indian Chief* (c). *Tabbs* v. *Bendelack.* As to all the purposes of commerce and war, men are identified, and so is their property, with the country where they reside. It is residence and not domicil that gives the national character to a ship. A man may reside half his life in a country without acquiring a domicil, if he always keeps alive an intention to return shortly, and is prevented. But he acquires national character, as to the purposes of war and commerce, by even a short residence. To entitle the plaintiff to recover, he should therefore have proved, either that the brig had a *British* register, or that he resided in the dominions of *Britain;* and the referees having reported without proof of either, have committed a plain mistake in law.

  2. The exception upon the materiality of the representation, has already been argued under the first exception.

  3. The policy attached while the brig was at *Havanna.* If she was not seaworthy then, though she might become so afterwards, the underwriters are discharged. Now although seaworthiness is a fact, yet if the referees have made a plain mistake in fact, their report must be set aside; and it is impossible to argue, that a vessel which, without any weather, leaks two feet in less than seven hours, is seaworthy. The referees should have asked the strictest proof, because the brig had been condemned as unseaworthy a short time before.

  *Smith* and *Ingersoll* for the plaintiff. 1. The only expressions relied upon to form a warranty, are those connected with the name of the ship, which we contend are mere description. There is certainly no express warranty, or declared intent to warrant. If such an intent existed then, it must be shewn from extrinsic circumstances. If it is a warranty, no doubt it must be performed whether material or not; but we are entitled to resort to circumstances, not only to explain the meaning of it, but to shew that the parties did not intend it to be a warranty. It is in the first place no warranty according to judicial decisions. The terms are used merely to identify the subject insured; they are matter of description,

1810.

MACKIE
v.
PLEASANTS.

(a) 1 *Rob.* 11.     (b) 3 *Rob.* 37.     (c) 3 *Rob.* 22.

1810.

MACKIE
v.
PLEASANTS.

and not of qualification; and in such a case, a mistake is of no moment, where it does not affect the risk, or where the vessel is known to the insurer. 1 *Marsh.* 221. 1 *Emerig.* 164. In *Goix* v. *Low* the majority of the court did not go upon the force of the terms themselves, but upon particular circumstances in the case. In *Le Mesurier* v. *Vaughan*, what is said of the warranty is extrajudicial; and *Le Blanc* J. plainly implies that the circumstance of its being written on the policy, does not make it a warranty, because he recommends to insurers to examine the policy, and see whether what is written, is matter of description or warranty. In *Lothian* v. *Henderson*, the terms came in after the description, as matter of qualification; and there still being a doubt in the parties, they agreed it to be a warranty, by a distinct writing, before the loss. In the next place the terms were not intended to be a warranty. The practice of underwriters cannot prevent that from being a warranty which is so in point of law; but it is a safe guide to intention. Had the defendant intended to make it a warranty, he would have put it in the usual place at the foot of the policy. The invariable usage is so. It is done to avoid uncertainty. The deviation from the practice shews that certainty as to the character of the vessel was already obtained, or was not wanted. The premium is another guide to intention. It was at the usual rate of sea risk upon vessels that were known; that is, had not the vessel been known, a higher premium would have been asked, or uncertainty would have been removed in the usual way. The limitation to perils of the sea, is another guide. *Prima facie* the national character of the vessel is of no importance upon this risk. Unless an evident design to warrant it, is shewn, it ought not to be presumed.

But if a warranty, it was proved to the referees. A warranty is to be strictly complied with in favour of insurers, but it is to be strictly construed in favour of the insured. It must be construed according to the commercial import of the terms, 1 *Marsh.* 249; and if in any sense used by merchants, the vessel was a *British* brig, the referees are right. It is not necessary that she should be a *ritish* registered vessel. The *English* navigation acts do not prevent *British* subjects from owning foreign built vessels, or deprive them of the protection of the *British* flag. The question is not

what is a *British* vessel within those acts, but within this warranty; and certainly within this warranty, and to the purpose of being protected, a foreign vessel *British* owned, is a *British* vessel. A register is not one of the documents required in any case to shew the national character of a vessel. *Marsh.* 317. 319. A bill of sale, a clearance, and a licence, are competent to this purpose, and the *John* had all these. She was moreover owned by a *British* subject, who was born, and lived in *Scotland*, and had not for any thing that appeared, changed his residence. This would be sufficient even upon the most liberal construction of the warranty. Such a vessel is as much entitled to the protection of the flag of *Great Britain*, as one having a register; and although she is not bound to take convoy, yet this is a fact which the underwriter must inquire into himself. The insurer is not bound to disclose it. *Long* v. *Duff*, *Marsh.* 284. How much more do the proofs given, satisfy the warranty upon a strict construction, made with reference to the intention of the parties. The register was of no importance to this risk. It would have given the brig certain privileges in an *English* port, but none out of it; and if the object was merely to avoid detention by *American* cruisers, that would happen as certainly in the case of a vessel *British* owned, as of one *British* owned and built. Whether the words then are taken as description or warranty, they have been sufficiently proved, and the referees have not erred.

2. The second exception has been answered.

3. The third exception is matter of fact; and unless the referees have committed a plain and obvious mistake, it will not vitiate their report; for the decision of facts is peculiarly their province. The condemnation at *New Providence* implies nothing against the brig. It was produced not by *Mackie*, but by the former owner, and as the referees say, by bribery, not by the actual condition of the vessel. She was repaired at *Havanna;* and it was not any radical defect in the vessel, but either the omission of a small piece of oakum, or the working of it out by the sea, that produced the leak. The referees had a right to say whether this made the vessel unseaworthy when the policy attached, and they have said that it did not.

The cause was argued at *December* term last, and held under advisement until this day.

TILGHMAN C. J. This case comes before us on exceptions filed by the defendant to the report of referees. The material exceptions are two. 1st. That the policy of insurance on which the action is founded, contains a warranty that the vessel insured was a *British* vessel, which warranty was not complied with by the assured. 2d. That it was proved to the referees that the vessel was not seaworthy.

The second exception may be easily disposed of. Seaworthiness was a matter of fact, on which the referees decided according to the best of their judgment, on the evidence produced to them. It must be a very strong case indeed, which would induce the court to set aside an award, because the referees had erred in matter of fact. Without entering into particulars, I do not think the fact by any means so clear, as to warrant the setting aside of the award on that ground.

The *first* exception involves matter of greater difficulty. The insurance was on " the good *British* brig" called the *John*, and her freight, at and from the *Havanna* to *Baltimore*. At the foot of the policy was a memorandum as follows: " declared to be against perils and dangers of the seas *only*, " and to end on capture." The premium was four per cent.

It was urged on the part of the defendant, that the expressions " the good *British* brig," amounted to a warranty, that the brig was a *British* registered vessel, properly documented to entitle her to all the privileges attached to such vessels. On the contrary it was contended, for the plaintiff, that this was not a warranty, but a description of the vessel, which was sufficiently complied with by proving to the referees, that the brig belonged to a *British* subject; and the plaintiff's counsel placed some reliance on the custom of putting the express warranties, intended to be made by the assured, in a written memorandum at the foot of the printed policy.

I do not think it very material whether the expression, " *British* brig," is to be called a *description* or a *warranty;* since it is allowed on all hands to contain an assertion, which the assured is bound to maintain. But it appears to me most

proper to call it a warranty, as it is a fact, not altogether immaterial, averred by the assured, and inserted in the policy. Whether it is in the body of the instrument, or in a memorandum at the bottom, can make no difference as to its being a warranty or not. The material question is, what is the meaning of it?

The words, " *British* brig," may have several meanings. Strictly speaking, a vessel owned by a *British* subject is a *British* brig. Or, they may have a more extensive signification; a brig not only *owned* by a *British* subject, but having a *British* register, &c. In ascertaining the meaning, I think it fair to resort to circumstances disclosed in other parts of the instrument. In that point of view, it is material, that the insurance was against *perils of the sea only;* so that it is not to be supposed, that the privileges attached to a registered vessel, entered into the contemplation of the parties, because those privileges could avail nothing against storms and tempests. And here it may be proper to take notice of the custom of the insurance officers, to insert at the foot of the policy, such matters as they think of sufficient importance to make the subject of a special warranty. These memorandums are generally expressed in plain terms, without regard to form; and I cannot help conjecturing, that if the insurers had contemplated a *British* registered vessel, they would have had a note of it at the bottom, without trusting to the general expression, " *British* brig," in the descriptive part of the policy. Considering the whole of the instrument, I am of opinion, that the expression " *British* brig," is to be understood, a brig owned by a *British* subject.

The next question is, whether the warranty thus understood, has been complied with. The referees say it was proved to their satisfaction, that the owner was a *British* subject. They have been examined, and given their reasons, with which I cannot say that I am dissatisfied. Upon the whole therefore, my opinion is, that the defendant has not shewn sufficient cause for setting aside the award.

YEATES J. After stating the facts and exceptions, proceeded as follows:

There is a material distinction between a *warranty* and a *representation.* A representation may be *equitably* and *sub-*

*stantially* answered; but a warranty must be strictly complied with. A warranty in a policy of insurance is a condition or contingency; and unless that is performed, it is no contract. It is perfectly immaterial for what purpose a warranty is introduced; but being inserted, the contract does not exist unless it is literally complied with. *De Hahn* v. *Hartley*, 1 *Term Rep.* 345. *Park* (*a*), and *Marshall* (*b*), make a further distinction between them, which is indeed sufficiently obvious. A warranty makes a part of the written policy. A representation is a state of the case, not a part of the written instrument, but collateral to it, and entirely independent of it. The same observation is made by Lord *Mansfield* in *Pawson* v. *Watson*, *Cowp.* 785. But it by no means necessarily follows, that all matters stated in policies amount to warranties. In *Le Mesurier* v. *Vaughan*, 6 *East* 387, *Le Blanc* Justice says, the decision in that case would induce underwriters and brokers to read policies before they were subscribed, and to see whether what was written contained matter of *warranty* or *description*.

I agree that the authorities cited fully shew, that if a warranty be written either straightly or transversely in the margin of the policy, it must be strictly followed, as much as if inserted in the body. But the question here recurs. Is this a warranty? What was the meaning and understanding of the contracting parties, when they made use of the expressions " *good British brig?*" Does it appear that they intended thereby to designate or identify the brig, which was the subject of insurance, or that the insured should warrant her to be a *British* bottom duly registered, within the terms of the *English* navigation acts of 26 *G. 3. c.* 60. and 27 *G. 3. c.* 19., accompanied with all the documents required by those statutes?

These facts are established by the testimony of the referees who were examined on the argument. The premium of *four* per cent. paid to the company was no more than the common sea risk; in the usual course of business of insurance, with which they had been much conversant, a greater premium would have been required, if the vessel had not been known; and all the cargo was on freight. They further

---

(*a*) *Park* 221. 1st ed.                    (*b*) 1 *Marsh.* 337. 341.

testified, that the accustomed method, as well of the insurance corporations as of individual underwriters, is to insert all warranties at the *foot* of the policy.

I do not mean to assert that it is indispensably necessary in this port, that a warranty shall be placed at the bottom of the instrument, or that commercial usage shall control settled established law. All I contend for is, that a policy should be construed according to the understanding of merchants, and observed with the purest good faith; and that in insurance cases in particular, mercantile usage must determine the precise meaning of the words. 1 *Mars.* 227. The intention of the parties, and not the literal meaning of the words, is to be attended to in the construction of policies. *Park* 33. 49. 1*st ed.* Their intention is if possible in the first instance to be collected intrinsically from all the expressions contained in the written instrument; but where that is silent as to the object of research, it may be fairly inferred from extrinsic circumstances, the perils intended to be guarded against, and the relative state of the vessel at the time. It is not expressed in this policy, whether the clause was introduced as a warranty or not; but it is of moment that the parties have declared, that the insurance was to be against the perils and dangers of the sea *only*, and to end on *capture.* Whether the brig was really and *bona fide* a *British* bottom, and duly registered as such, or whether she was the property of a *British* subject, neither added to nor diminished the hazards of the underwriters. In either case, her capture would depend on the same grounds and principles; and the risks to be run would be proportioned to the goodness of the vessel, and the nautical skill of the master and mariners on board. The premium of a sea risk is only demanded, on the voyage of a known vessel. But whence comes it, that the directors of the United States' Insurance Company did not insert the words now relied on as a warranty, in the accustomed part of the policy, where warranties are introduced by the commercial usage of *Philadelphia?* It is not insisted that this is necessary in order to give those terms the effect and force of a warranty, if they were really intended to have had that operation; but it is a circumstance of no inconsiderable weight as to the defendants, that by pretermitting their former habits, they have evinced their understanding of the

contract, as not amounting in this particular to a warranty. The natural, plain and obvious meaning of the adjective *British*, points to the quality of the subject of insurance, and serves as an adjunct for the purpose of identification, not material to the risk insured against.

I am by no means satisfied that this clause imports a warranty on the part of the insured; and the strong inclination of my mind is, that it is answered by proof that a *British* subject was owner of the brig. The referees were fully satisfied that *Robert Mackie* owned her, and that he was a subject of *Great Britain*, born in *Scotland*, from his broad *Scots* dialect, which could not well be mistaken, his intimate knowledge of the local state of that kingdom, and his letter of introduction as a *Scotsman* to his countryman. This was strong presumptive proof of the domicil of the party for whose use the policy was subscribed, and it lay on the underwriters to repel it by other proof. It appeared also, that when the vessel was shipwrecked, she had on board a *British* licence and clearance. The referees thought, that the evidence fully ascertained the truth of the words in the policy, that she was a " *British* brig," in their sense of the expressions.

As to seaworthiness, there is no doubt that every vessel insured must, at the time of the insurance, be able to perform the voyage, unless some external accident should happen, otherwise the underwriters are discharged from their responsibility. But here no proof has been given of any latent defect in the brig, known or unknown to the insured. Considerable repairs were made upon her before the voyage began. Several masters of ships embarked on board of her, shewing thereby their strong sense of her seaworthiness; and her being thrown on a ridge of rocks, fully accounts for her loss. Of this the referees were the competent judges as a matter of fact, and they have expressed their entire satisfaction that the brig was seaworthy, before she sailed the second time from the *Havanna*.

Upon the whole, I do not think that these referees, who have for some years past been actively engaged in the business of insurance, have erred in such a manner either in law or fact, as should induce the court to interpose, and are therefore of opinion that the report should be confirmed.

BRACKENRIDGE J. In applying my mind to consider this report, I am led to examine to what extent, under the head of *approving a report*, the court will inquire into the ground of fact, or law, on which the report has been made. For, though I have become reconciled to the extent to which, *in practice*, the courts have gone, in examining reports of referees, yet I never have been satisfied, and am not now satisfied, with the principles, which have been laid down, in governing that practice. For these would seem to warrant a practice beyond what has been exercised. The decision in *Williams* v. *Craig*, 1 *Dall.* 314, made a considerable noise in this state at the time it was determined; and I will acknowledge, that, notwithstanding my high respect for the legal abilities of the then Chief Justice, I could not perfectly acquiesce in the whole extent of the principles laid down by him on that occasion: viz. " that the same cause which would " induce us to set aside a verdict, and grant a new trial, " should be sufficient for vacating an award. In the one case " the decision is made by twelve men upon oath, with all " the information which the judges and learned counsel can " communicate. In the other, it is the act of persons, who " are not sworn to the faithful discharge of their duty, and " who are unassisted, either in ascertaining the law, or, in " developing the fact, upon which the question submitted to " them may depend; which abundantly shews, that the " sacredness of awards ought not to be extended beyond " that of verdicts, and must justify the court in putting them " upon the same footing, when errors are suggested either in " clear points of law or fact.

To this doctrine I can by no means subscribe; for, it is the court, or some one, or more of them, before whom the cause was tried, that are to judge on a motion for a new trial, whether the verdict is against evidence; whereas in examining a report of referees, the facts of the case are out of the knowledge of the court, or any of them; and this forms a reason why the court cannot, with so much advantage, examine a report of referees, in order to approve, and why the court cannot go so minutely into the evidence, in the case of a report, as in the case of a verdict.

But it has been said by the Chief Justice, in the case to which we have referred, that our act of assembly of 1705, is

1810.

MACKIE
v.
PLEASANTS.

to be considered " as *introducing another species of awards* " *than those known in England.* This act provides, that " where the plaintiff and defendant consent to a rule of court " for referring to certain persons mutually chosen &c. the " award &c. being made according to the submission of the " parties, and *approved* of by the court &c., shall have the " same effect, and be as available in law, as a verdict of " twelve men."

This act may have had a reference to the laws agreed upon in *England* some years before, by which it was provided, " that all trials shall be by twelve men;" and which provision might be supposed to exclude the settlement of controversies by referees; and, it might be necessary therefore, to give the courts power, under rules of court, to refer matters and give judgment on awards, as on the verdict of twelve men. But it is sufficient to account for the provision, that it became necessary, or was at least salutary, in order to give effect to an award; and it is in this view of the case that I consider it as departing from the law of *England;* not as introducing a *new species of awards,* but as giving *a new remedy on awards;* that is, giving them to be considered as a verdict, in order to support a judgment and execution. For before such provision, the remedy could be, but by an action on the award, or an attachment from the court.

It never could be meant to narrow the effect of a report, by giving it the force of a verdict; and it would be narrowing it, to restrain the province of referees to that of a jury in giving a verdict. On the contrary, I take it, no change is made in the law of *England* in this particular; but the superintendence of our courts over a report remains precisely the same as under the jurisprudence of that country; taking the superintendence of the courts of law, and that of chancery together. For under the head of *approving,* there being no court of chancery with us, our courts are warranted by that act, in going the same lengths, as the courts of law, and courts of chancery in *England.* And I take it this was the view of this act, and the reason of the provision, the *approving* by the court. When we have ascertained therefore how far a court of law, and court of chancery will go, in examining into the grounds of a report, we shall have precedent to guide us, in considering what shall justify the setting aside

a report here. For passing over the setting aside a report for misbehaviour of the parties or referees, or from what appears upon the face of the report, which have been always grounds of setting aside even in courts of law, under the head of *approving* we undertake to inquire into the grounds of the report, not as we consider ourselves bound to do in the case of a verdict, but as done in the court of Chancery in *England*. The extent is laid down in that case to which I have alluded, viz. that " in the *case of a clear error in point of law, or fact, the court will interfere.*" This language has never been to me perfectly satisfactory. What application is there ever made to set aside a reference, where it is not insisted on the one side, that the error is plain, and, on the other, that there is no error at all. But the language of the Court of Chancery is not in these unqualified terms. That court is delicate in calling on referees to lay before the court the reasons and grounds of their award. " A bill will " not lie to compel the arbitrator to discover the grounds on " which he made his award," and for this I refer to *Kyd on Awards* under this head. " It is unreasonable that he should " be put to so much trouble and expense. If there be any " palpable *mistake* made by the arbitrator, or a miscalcula- " tion in an account that had been laid before him, the party " aggrieved may bring his bill against the party in whose " favour the award is made, to have it rectified." *Kyd on Awards* 332. " A material mistake in point of fact, an erro- " neous statement of an account, even a plain mistake in " point of law, coupled with other circumstances, are grounds " for an examination in a court of equity, from the result of " which the award may be partially affected, in a greater or a " less degree, and sometimes wholly set aside. Thus, though " a court of equity, where the only object of the bill is to set " aside an award, will not permit the plaintiff to discuss " legal objections to it, but will confine him to those for par- " tiality and corruption, yet, if the bill, beside praying to " set aside the award, pray also for an account, he will be " permitted to make legal objections, in order to let in such " an account. If indeed the arbitrators appear to be *mistaken* " in a *doubtful* point of law, the award may be permitted to " stand, though the court after great deliberation, should be " of a different opinion. And, in a late case, where no law-

"yer could doubt upon the point of law, this distinction "was laid down by the court of King's Bench; that where "the arbitrators, meaning to follow the law in their deter- "mination, happen to mistake it, this is a good reason for set- "ting aside their award, so far as it is affected by that mis- "take. But where, knowing what the law is, or laying it "intirely out of their consideration, they make what they "conceive, under all the circumstances of the case, to be an "equitable decision, it is no objection to the award, that in "some particular point it is *manifestly against law*." *Kyd on Awards* 350. For this reason the award was confirmed, although the arbitrators stated "that they did not conceive "they *were awarding on the point according to any fixed* "*rules of law, but doing what appeared to them, under all the* "*circumstances of the case, strict and impartial justice*." *Kyd* 354. In the case of the *South Sea Company* v. *Bumstead*, Lord *Talbot* said that "arbitrators were in the nature of judges, and "in some respects had a greater latitude, not being confined "within the rules of a court of law, or equity; and therefore "might make such allowance, as could not be admitted in a "court of judicature." *Kyd* 356. From these citations, which have been made by the author of this tract, and which I have made from him, it will be remarked that the language of the Court of Chancery, in the superintendence which it exercises in the examination of reports of referees, is that of an *evident mistake* of the referees. It is not *error*, which is a term in legal language that embraces more. For that, in strictness of legal acceptation, may be *error* in point of law, which is not *mistake*, as is laid down in the late decision to which he refers. For a great advantage of a reference oftentimes is, *to escape the application of a general rule to the particular case;* whether on the ground of admitting evidence of the fact, or, in applying the law to the fact. It would seem to be in a great measure, a matter of discretion, and with much greater latitude than in granting a new trial in case of a verdict, where and to what extent a court will interfere in setting aside the report of referees.

In the case before us, is there a warranty, that the brig insured was a *British* brig?

There is an *express*, and an *implied* warranty; in other words, a warranty in deed, and a warranty in law. A war-

ranty in law must be wholly a matter of law, because it is the law that raises it. A warranty in deed, or *de facto*, cannot be matter of law, unless where words are used to which the law has affixed, by decisions, a legal meaning, so that it ceases to be a matter of construction, whether within the intention of the parties, a warranty exists. Now, it does not seem to me that decisions have been produced so perfectly in point, and of such direct bearing, as to have fixed the construction of the words so used, so as to preclude all consideration of intention. On the contrary, I think it remains clearly a matter of construction depending on intention; and that the meaning, and extent of the terms, is to be collected from all parts of the policy taken together, and even from *extrinsic circumstances*. And, I take it, evidence of the usage of such terms is admissible in explanation of the extent of them. The manner in which the words are introduced, strikes me as indicative of the laying too little stress upon them by the parties, to construe them a warranty. It cannot reasonably be supposed, and ought not to be supposed, that the insurer, expecting a warranty of such extent, would rest satisfied with having it so loosely and uncertainly expressed. It is his own fault not to have had it clear of all ambiguity; and on the principle that the instrument shall be construed most favourably for the assured, in a doubtful case, and to me this is at least doubtful, I incline for the assured.

Nor is it clear to me that these words can be construed even a representation. On the contrary, it seems to be a case where as much may be said, and perhaps, with as much appearance of good reason, on the one side as the other. If a representation, whether it be *material*, or otherwise, is a question not clear of all difficulty. I do not think it was meant to be considered as material; otherwise we should have had it unequivocally expressed to be. Such looseness and uncertainty are not to be favoured. Let underwriters look to the instrument, which they sign; and if they expect a warranty in a case where the law will not imply it, let the stipulation be such that there can be no doubt about it. The circumstance of these words, *the British brig*, not being where a warranty is professed to be made as to other matters, but coupled merely with the designation of the vessel, and the name *John*, I incline to take it as the referees have

1810.

MACKIE
*v.*
PLEASANTS.

done, to be matter of description merely; and in that case we are clear of all authorities and reasoning, on the subject of warranty or representation. I think the referees were justified in construing this instrument, from the juxta-position of the words, from the usage of introducing matter of description in that manner, not meaning to give it the effect of a warranty or a representation, and from the understanding of merchants. Be that as it may, I am not so clear in it that I will undertake, as at present advised, to say, that they were not justifiable in taking this latitude. That being the case, I will not meddle with the conclusion they have drawn, that it was not a warranty, or a representation. The circumstance of the risk insured against, weighs much; *the perils of the sea.* It does not necessarily force itself upon the mind, that the circumstance of *British built* was a consideration in the insurance, as lessening the risk; nor of being *British owned.* The possible contingencies of being in a better state, from being less liable to be suspected of having violated the embargo, and so, less likely to be questioned, and the continuance of the risk at sea less likely to be protracted, are remote considerations, which it does not seem to me can be presumed to have been in the minds of the insurer, so as to have had in view the circumstance of *being British,* as a *substantial part of the contract.* If so, it became him to have had it more explicitly stated, and not to leave it to be inferred by implication. Were a direction to be given to a jury, I do not see that I could take it from them as a matter of fact, whether a warranty, or whether a matter of material representation, made a part of the contract in this case. Much less, where it is a reference to merchants, and it may be fairly presumed, for the express purpose of having an investigation upon liberal principles, would I undertake to set aside what they have done.

The second exception appears to me to have a question of more substantial difficulty in it. For laying out of the law, the circumstance of being condemned a short time before as *unseaworthy,* inasmuch as it is alleged, and the referees may have been justified in concluding from what they had before them, that this was but to manage the procuring a sale, in order to acquire the denomination of a *British* vessel, yet, the springing a leak and two foot water in the hold immediately after sailing, is

evidence violently presumptive that the vessel was not sea-worthy at the time of sailing; and, at which time, the policy attached. Suppose it owing to the stowage, and first lading of even a new vessel, that a leak springs immediately, or in a very short time. Can that vessel be said to be seaworthy? It is strongly presumptive that she was not; and I do not see how a jury could get over it. But if just after weighing, she is discovered to be deficient, and is unloaded, and then re-paired, is the insurer discharged? Sailing a short distance would not seem to make a substantial difference from just weighing, and setting sail; and yet if we admit that the policy may notwithstanding have attached, to what distance may we allow her to have sailed, and within what time may we consider her probation as continuing? It is possible that the referees in this case may have considered the first sailing, and the second, as one sailing; and I am not clear that they may not have been justifiable in so considering it. It cer-tainly would have been advisable to have given notice to the underwriters, that they might have had it in their power to say whether they would consider the policy as void, or as still existing. That not having been done, but taken for granted on the part of the assured, that it did continue, the strict consideration will be, whether the vessel was sea-worthy at the first sailing; or whether the second sailing was all the same sailing, and to be considered as the first. Did it appear to me from the examination of the referees, that they had the point precisely under their consideration as to seaworthiness at the time of the first sailing, and had presumed that she was seaworthy, and passed upon the ques-tion, this being purely matter of fact, I certainly should not think myself justifiable in overthrowing their conclusion. But I am not clear that they did confine their views to this point precisely. At the same time I am not clear, that they were not justifiable in considering the vessel as still in port until she did put back; and that the policy may be considered as attaching at the time of the second sailing. There is a nicety in this which might deserve consideration. But I in-cline to think from examination of the referees, that they con-fined themselves to the state of the vessel at the time of the first sailing; and however difficult it might be for me to believe that she could be in a seaworthy condition, yet I

1810.

MACKIE
v.
PLEASANTS.

should not think myself bound to differ from them; and unless bound, by a strong sense of the injustice done, I should not be disposed to do it.

Award confirmed.

*Philadelphia,
Monday,
March 26.*